# HEIRS OF GARLAND, DECEASED, *v.* CHOCTAW NATION.

## APPEAL FROM THE COURT OF CLAIMS.

No. 129.   Argued January 12, 1921.—Decided June 1, 1921.

The Choctaw Nation constituted four persons a delegation to represent it in pressing money claims against the United States, promised them a percentage for their services rendered and to be rendered, and, when an appropriation was secured from Congress as a result of many years of negotiations and proceedings during which the delegates were succeeded by others, passed an act appropriating the agreed percentage out of the fund held by the United States, with a direction that it be paid to the two existing delegates, as successors of the preceding delegates, to enable them "to pay the expenses and discharge the obligation in the prosecution of said claim, and to settle with the respective distributees of said delegation," the act further declaring that payment to the two delegates should be accepted as a complete payment and final discharge of all obligations of the Choctaw Nation to the delegation and as a full and final settlement of the amount due under its contract.   Upon these and other subsidiary facts,—

*Held:* (1) That the obligation of the Choctaw Nation was to the delegates individually and not to the delegation as a body, and that the two existing delegates, in collecting and disbursing the money, were agents of the Nation merely, so that its payment to them did not discharge the Choctaw Nation's obligation to the heirs of a former delegate who had rendered part of the service.   P. 444.

(2) That while, under the act authorizing this suit (May 29, 1908, c. 216, § 5, 35 Stat. 444, 445), any right of such heirs to recover on account of service and expenditures by their ancestor must be determined not upon his contract but upon the principle of *quantum meruit*, a petition alleging valuable services should not be rejected upon the technical ground that it asserted and relied upon the contract.   P. 445.

54 Ct. Clms. 55, reversed.

THE case is stated in the opinion.

*Mr. Harry Peyton,* with whom *Mr. James K. Jones* and *Mr. W. N. Redwine* were on the briefs, for appellants.

*The Solicitor General* for appellee. -

MR. JUSTICE MCKENNA delivered the opinion of the court.

This suit is based, as its ultimate foundation, on an Act of Congress of May 29, 1908, c. 216, § 5, 35 Stat. 444, 445, which provides as follows:

"That the Court of Claims is hereby authorized and directed to hear and adjudicate the claims against the Choctaw Nation of Samuel Garland, deceased, and to render judgment thereon in such amounts, if any, as may appear to be equitably due. Said judgment, if any, in favor of the heirs of Garland shall be paid out of any funds in the Treasury of the United States belonging to the Choctaw Nation, said judgment to be rendered on the principle of quantum meruit for services, rendered and expenses incurred. Notice of said suit shall be served on the governor of the Choctaw Nation, and the Attorney General of the United States shall appear and defend in said suit on behalf of said nation."

The case is not easily stated, though simple in ultimate resolution. It turns upon the relation of Samuel Garland and his right to compensation as one of the delegation of the Choctaw Nation to procure for the Nation a recognition and payment of money due from the United States in settlement of or in payment for lands east of the Mississippi River ceded to the United States under certain treaties. The case as made by the petition is this: Samuel Garland was a member of the Choctaw Tribe of Indians and in 1853 he, with three others, were created a delegation and authorized to settle all unsettled business between the Choctaw Nation and the United States. In

1855 the Chiefs of the Nation agreed to pay the delegation, naming them, twenty per cent. upon all the claims arising to the Nation or individuals for their services in negotiating the treaty and for other services which were to be rendered thereafter in Washington.

In pursuance of this authority they entered into negotiations with the United States for settlement of the controversies concerning what, if anything, was due on account of matters growing out of certain treaties (they are set out in the petition) and for the payment for lands ceded to the United States by the Choctaws.

The result was the direction by an Act of Congress (1888, 25 Stat. 239) of the payment to the Choctaw Nation of the sum of $2,858,798.62 in satisfaction of a judgment of the Court of Claims in favor of the Nation.

On February 25, 1888, the Nation, on account of the death of Samuel Garland, and for the purpose of paying his estate and the other members of the delegation, appointed Campbell LeFlore and Edmund McCurtain agents of the Nation to make requisition upon the United States for the amount due Garland and the other delegates for the services rendered the Nation, and for moneys expended by them. Twenty per cent. of the amount appropriated by Congress to pay the judgment of the Court of Claims was the amount fixed to be paid.

The appointment of LeFlore and McCurtain was without the consent of Garland's estate or the consent of his heirs.

LeFlore and McCurtain collected from the United States $638,919.43, the same being twenty per cent. of the judgment of the Court of Claims, and were charged with the duty of distributing the same equally.

In 1889 they paid to the heirs of Garland $43,943.20, but refused to pay the balance due amounting to $115,786.65.

The Nation has never denied the indebtedness to the

estate of Garland but recognized it by an act passed by its General Council in 1897 and authorized its payment by warrants issued by the national auditor.

The act was vetoed for the reason that it would exhaust the available funds in the treasury of the Nation and force the closing of the Choctaw schools. The estate having no power to sue the Nation, could not do so until authorized by an act of Congress.

The petition sets forth the respective interests of the heirs of Garland.

The Court of Claims found some of these facts but found other facts and concluded from them that the contract of the Nation was with the delegates as a body and that the Nation was not responsible for any failure on the part of LeFlore to pay the estate of Garland all that was due Garland. In other words, the court held that LeFlore and McCurtain were not the "'agents' of the Choctaw Nation, for whose misapplication of the fund, if they did misapply it, the Nation was liable," but that they were when dealt with "the delegation, the successors of the original delegation, standing in such relation to the Nation and to other members of the delegation or their beneficiaries that the payment made to them as it was made, is to be held an acquittance of the nation."

The conception of the opinion is that the delegation was a unit, constituted such and intended to act as such, the survivors or even the survivor of those appointed succeeding to the powers and rights of deceased delegates, that the Nation so regarded and so dealt with them, and that, therefore, LeFlore and McCurtain succeeded to the rights of the delegation, could receive the powers conferred upon them by the enactment of February 25, 1888, and could accept any sums that came to them under that enactment "as a complete payment and a final discharge of all debts and obligations of the Choctaw Nation to" the delegation under the contract of 1853.

This being the conception of the court its final conclusion was, that the payment made to LeFlore and McCurtain served to discharge the Nation from any further liability to the delegation or any member thereof or their representatives, and on that ground it ordered the case to be dismissed.

As we have seen, there was a delegation constituted, and Garland was a member of it, and its compensation was agreed to be "twenty per cent. upon all claims arising or accruing to" the "Nation or to individuals under the treaty of June 22, 1855, for their services in negotiating said treaty and for other services which are to be rendered hereafter at Washington." It will be observed there was no disposition of the amount that might be received, nor distribution of it nor of the services that might be required to be performed, nor designation of who was to receive or control it.

Delegates, however, died and others were appointed in like generality, and finally there was a concentration in LeFlore and McCurtain, and, the National Council, reciting that the delegates preceding LeFlore and McCurtain had recovered from the United States $2,-858,798.62, and that the delegates were entitled to twenty per cent. of the amount, that percentage was appropriated out of the fund and directed to be paid to LeFlore and McCurtain as delegates and successors of the delegates of 1853, "to enable them [LeFlore and McCurtain] to pay the expenses and discharge the obligation in the prosecution of said claim [the claim of the Nation against the United States], and to settle with the respective distributees of said delegation."

There was also an appropriation for other sums due the delegation and it was enacted that all of the sums should be paid to LeFlore and McCurtain, describing them as successors to the other delegates and when so paid to be accepted "as a complete payment and a final

discharge of all debts and obligations of the Choctaw Nation to said delegation" under the contract of their appointment. And it was enacted that the amounts provided to be paid should "be accepted as full and final settlement of the amount due under their respective contracts" and the remainder of the amount appropriated by Congress should be retained in the Treasury of the United States, subject to the legislation and requisition of the Nation.

In 1873, however, there was recognition of liability to the delegates and it was provided that the National Treasurer be authorized to receive the appropriation and to pay (among other obligations) "20 per cent of such appropriation for the delegates of 1853 and 1854, to enable them to discharge all liabilities and obligations under said contracts [there were other contracts than that with the delegates] and all expenses necessarily incurred in recovering said claim." It was provided that all just debts due the Nation from the delegation should first be deducted.

The enactment of 1888 was a deputation to LeFlore and McCurtain to collect and disburse the congressional appropriation, and they became for that purpose the agents of the Nation, not the agents of the delegation, and it was the first deputation of that power. By a prior enactment the payments made to the delegation were from the National Treasury, and another (1867) provided for such payment. In other words, until the enactment of February 25, 1888, the control of the appropriation was in the Nation and payments out of it by the Nation.

Our conclusion, therefore, from the record, is not that of the Court of Claims. There was implication, at least, of liability to the delegates individually. And this was the understanding of the delegates. LeFlore so understood it and the payment made to Garland's estate was a recognition of it. The payment is distinctly in opposition

to the contention of the Government and the conclusion of the Court of Claims. Both the contention and conclusion assert a unity in the delegation, the rejection of any individual payment or reward to the delegates, a time limit upon compensation for their services, however great or effective, a kind of *jus accrescendi* in the successors of deceased delegates. If such right existed at all, it would have existed even though the succession had come a moment before the congressional appropriation was made, and no services whatever rendered by the successors of deceased delegates.

And these views must have impressed Congress, and induced its enactment authorizing suit against the Choctaw Nation. Not, it is true, upon the contract, because other services than Garland's were rendered in procurement of the appropriation and should be considered, and Congress therefore required the judgment in the suit "to be rendered on the principle of quantum meruit" for what Garland did and expended.

It is objected, however, that the suit was not asserted or prosecuted on that basis and that there is no description of the services of Garland or their value, and therefore no elements for a judgment established, such as the statute authorized. It authorized, the explicit contention is, a judgment on a quantum meruit, and that therefore "no judgment can be rendered on a petition which seeks to recover merely upon the ground of a contract."

The contention under the facts disclosed in the petition is technical. The petition showed services rendered and, if the petition be true, valuable services—and for them there should have been recovery if the Nation was liable, and we think it was. How much we do not say nor did the Court of Claims consider, it being of opinion that the Nation was not liable for anything. Upon the return of the case it may determine the amount due Garland, if

anything, dependent upon what his services contributed in securing the congressional appropriation.

The judgment of the Court of Claims must therefore be reversed and it is so ordered.

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE CLARKE took no part in the consideration and decision of this case.