Booth, Judge,
delivered the opinion of the court.
This case and the one of the Heirs of Peter Pitchlynn differ only as to the extent of the services rendered. The special jurisdictional acts sending both cases to this court are identical in-every respect, 35 Stat. 445. What was said in the Pitchlynn case with reference to the history and development of the controversy applies with equal force to the present case, and we will not repeat it herein.
The present plaintiffs, heirs of Samuel Garland, deceased, are contending for a judgment in the sum of $115,786.65 for his part in securing the final settlement of the net proceeds *792 claim. This contention rests upon a conclusion that Samuel Garland is legally entitled to the full five percentum accorded him in the contract between the delegation of 1853, of which he was a member, and the Choctaw Nation, set-out in Finding III.
The jurisdictional act limits recovery upon the principles of qruantwm, meruit, what the services rendered were reasonably worth, and while the contract is evidentiary, it is not conclusive, and we are not bound to observe it, especially as entitling the heirs to have it enforced after the death of Samuel Garland. Congress manifestly refused to circumscribe our jurisdiction in this respect, and intended, as expressed in the jurisdictional act, to grant authority to award a judgment for what may appear from the record as equitably due.
Samuel Garland was a member of the Choctaw Nation, conspicuous at times in its affairs. He lacked many of the characteristics of Peter Pitchlynn, his associate delegate, and was far from the equal of Pitchlynn in ability or assertiveness. Pitchlynn dominated the delegation of 1853 and was the moving force. Garland and the remaining delegates simply followed along. The plaintiffs, in their long, very exhaustive, and interesting briefs in this case, do not poin^out any conspicuous individual service on the part of Garland. So far as the record discloses, Garland was only in Washington four times, once in 1854, and again in the years 1855, 1856, and 1869, and if he did more than approve what Pitchlynn was actively engaged in doing, we are unable to extract it from the present record. He, of course, was a part of the delegation, and his name appears in its proceedings, and the council of the Nation in its dealings with the delegation, duly recognized him as a part thereof; but when the task is imposed of segregating the individual services of the plaintiffs’ decedent from those of his associates and ascertaining what he did in the preparation of papers, supplying information, or suggesting plans and procedure, forwarding settlements, or manual and mental work of any character, it is most difficult to ascribe to Samuel Garland the doing of any vast amount of labor or contributing to the result accomplished to any predominating extent.
*793 We awarded judgment in the Pitclilynn case, crediting him with his full fire per centum of the sum realized in the net proceeds case, and we believe this to be ample, and in a measure generous, and if Garland was in the same situation we tvould do likewise in this case. Samuel Garland died in March, 1870, sixteen years prior to the final settlement of the claim, and obviously, unless-we may -ascribe what was Accomplished prior to his death as the real, important, and substantial thing accomplished, we can not allow his estate for what was done after his death, The recovery sought here is for personal services. It is true Pitchlynn died in 1881, five years prior to the final, judgment, but it seemed to us that at the time of his death all that he could have possibly accomplished had been done, and all that remained to be done depended upon lawyers and not laymen. .¿Pitchlynn had exhausted-the field of his endeavors.
We may, we think, with propriety and fairness to all concerned, recognize the division of this contest as time and events apportioned it. According full recognition.to Garland's efforts, the equal of Pitchlynn in this respect, what had been the real beneficial results obtained up to the date of Garland’s death. The treaty of 1855 had been, obtained, the Senate award had been reported in 1861, and $250,000 in- cash had been paid and $25,0,000 in bonds awarded, biff not then or afterwards - paid until 1886., Then the Civil War came on, and for four or more years nothing was done....The next step was the treaty of April,. 1866, procured bythd.com-mission appointed by the Nation-in October, 1865, a treaty repairing the damage occasioned the Indians by the intervention of war and restoring the rights accorded the Nation in the treaty of 1855, thus completing, as we believe we may well say, tile first half of the contest. To--secure the benefits,of the treaty of 1855, revive’d by the, one of-, 1866, .required twenty years of labor and effort. -The treaty of I860 marked out the limits of settlement, the Senate in its award-followed the lines so marked out, and there the two, factors- stood definite and available, but to secure appropriations and a fulfillment of "the -treaty and award required an -effort and expenditure of labor and service equally as- extensive, as. all *794 that had been expended in prior efforts. The repeated and earnest efforts of a small army of people, directed in every available channel, failed to secure to the Nation its accorded rights until the contest was removed from the uncertainties of the departmental and legislative departments of the Government to the courts, where it was ultimately settled with reasonable dispatch. Unfortunately Samuel Garland died before the final struggle had taken definite shape; he was not a part of it, and surely it may not be said that what was done subsequent to 1866 was relatively of less importance than what preceded this date. One was indeed as important as the other. As we said in the Pitclilynn case; we regard the services rendered in finally procuring the jurisdictional act sending the case to the courts as one of signal value and importance. It closed the case; it afforded a forum where reciprocal rights and liabilities might be adjudicated, where the pai'ties were assured of full and complete hearing, and what is of more valué, assured the parties that a judgment rendered would be promptly and fully paid. This was accomplished eleven years after Samuel Garland’s death.
It is said, and most significantly, that the authorities of the Nation as late as 1888 recognized the Nation’s liability to Sam-uel Garland as extending to five per centum of the -final sum obtained, in effect conceding his services to be worth this amount. The legislation of the council appointing Leflore and McCurtain delegates to receive and disburse thekj|éa#? jcnming to the Nation as a result of the judgment in tlfáPlf^'bceeds case, clearly imports a legislative intent to settle ■ with the delegates of 1853 and their successors. The language is, “ settle with the respective distributees of said delegation.” The delegation, as originally established, was a continuing body; provision was made for vacancies due to death or resignation, vacancies did occur, and the personnel of the delegation changed. So that, while Leflore and McCurtain did treat the. Garland estate as entitled to the full one-fifth of the judgment, they, at the same time, made a vast number of charges against his gross compensation, which included money paid to delegates, successors to the original delegation. Again, we repeat, under the jurisdiction granted this court, we are not to import verity to what *795 Leflore and McCurtain did, nor are we bound to accept tlieir settlement or interpretation of the authority under which they ¿cted. The case is to be disposed of upon the principles of quantum meruit, and what concerns the court now is not a confirmation of Leflore and McCurtain’s settlement, but was the sum the Garland estate received from them, added to other sums paid, reasonably compensatory for Garlamos services during his life? The Supreme Court in the Garland case, 256 U. S. 439, had before it in the findings of this court the Leflore and McCurtain settlement, it was then exactly as it is now, and notwithstanding these available balances, the case was remanded for us to find, “ what, if anything, is due Garland.” If the record of fraud and corruption erected by the plaintiffs' counsel is to prevail, and we have not the slighest doubt of its truthfulness, tlie ease with which the legislative council of the Nation yielded to sinister influence is, indeed, a most potent factor in supporting the court in scanning what was done with the greatest care, and casts an unwholesome suspicion upon Choctaw legislation and council approvals of the disbursements of Indian funds. In this case, without apparent opposition,' and with a unanimity acutely suspicious, the council of the Nation, whenever called upon, unhesitatingly approved the disbursement of more than one-half of the net proceeds judgment, a vast sum of money, which in many instances found its way into the pockets of certain individuals whom the committee of Congress denounced as nothing short of venal and corrupt.
We have not, of course, disregarded these favorable manifestations in Garland’s behalf. We have given them, along with the contract, the probative value we think they are entitled to receive. If they are conclusive, then obviously all we were to do under the order of remand was a bookkeeping-accounting. This has not been our view of the case, nor our construction of the intention of Congress in conferring jurisdiction upon this court in the premises.
Samuel Garland received out of the $250,000 cash appropriated by Congress in March, 1861, $18,731.86. The Choctaw Council, by its appropriation acts for the years 1857, 1858, 1859, and 1860, paid him $11,000, or in all *796 731.86 received by him personally. After his death, under the settlement, of Leflore and McCurtain, his: estate received an additional allowance of $49,894:29, or $79,626.15 in all. He should be charged with one-fourth of $25,000 loaned by the loyal Choctaws to the delegation of 1853 and which they in writing agreed and authorized payment out of the fees paid the delegation from the net-proceeds case, which amounts to. $6,250, a sum of money the delegates received, and the record shows they admitted as due from them, making all fold the sum of $85,876.15 paid as remuneration for his services. It is absolutely inconceivable that he could have earned more. Expenses incurred are not claimed, and are proved to have been paid. Treating the case on. the principles• of quantum meruit, aside from contract provisions, and'giving the record the most liberal consideration, it is our opinion that the petition should be dismissed. It is so ordered.
Hat, Judge; Downey, Judge; and Campbell, Chief Justice, concur. _