Booth, Judge,
delivered the opinion of the court.
This and the companion case of Heirs of Samuel Garland v. Choctaw Nation are for the most part identical in point of fact. The Garland case was before this court and on Feb *800 ruary 17, 1919, the petition was dismissed,. 54 C. Cls. 55. The Supreme Court on appeal reversed our judgment of dismissal, and in remanding the case said: “ Upon a return of the case it may determine the amount due Garland, if anything, dependent upon what his services contributed in securing congressional appropriations. ” 256 U. S. 439.
Peter Pitchlynn and Samuel Garland were associate delegates of the Choctaw Nation, employed at the same time, under the same agreement for precisely the same purpose, and while separate special jurisdictional acts were passed sending their cases to this court, acts identical in verbiage and scope, the two cases are subject to like treatment, save in the one important particular of the extent of service rendered, and. compensation therefor. Therefore, the decision of the Supreme Court in the Garland case applies with equal force to the present case.
The jurisdictional act just referred to, approved June 21, 1906, 34 Stat. 325, 345, grants authority to hear and determine the case and render judgment upon the principles of quantum meruit for services rendered and expenses incurred in the matter of the plaintiff’s claim against the Choctaw Nation.
The claim which occasioned the employment of Peter Pitchlynn and his associates had its origin in the treaty of September 27, 1830, 7 Stat. 333, between the Choctaw Nation and the United States. The Choctaw Nation contended that under the treaty the nation was entitled to the net proceeds of the sale of lands in Mississippi, ceded by the nation to the United States in consideration of their removal to the western country. This, in a general way, without details, was the real contest, and Indian grievance against the Government, long cherished and continually asserted. During its continuance the case was designated and known as the “ net proceeds case, ” and as such we will continue to refer to. it.
On November 9, 1853, the Choctaw Council passed a resolution appointing Peter Pitchlynn, Samuel Garland, Israel Folsom,, and Dixon W. Lewis delegates of the nation, invested with jurisdiction to institute a claim against the United States for the proceeds from the sale of their eastern lands. The delegation was by this resolution clothed with *801 plenary authority to settle and dispose of by treaty or otherwise not only this particular claim, but all others of any sort or character, and conclude, if possible, all outstanding-monetary controversies between the nation and the Government.
Pitchlynn came to Washington in 1854, and from that date until his death in 1881 he continued to reside in Washington, actively engaged in the prosecution of the net-proceeds claim. It is a just inference from the record before us to ascribe to Peter Pitchlynn a measure of intellectual ability-far above the average of the members of the.Choctaw Nation. of which he was a part. He was, in fact, the controlling member of the delegation; his activities far exceeded those of his associates, and it is not to be denied that he was tireless and persistent in his efforts to secure a settlement of the net-proceeds claim. At the same time the record is equally clear that, aside from whatever natural affections he may have had for the Choctaw Indians as a tribe, and a desire to see them obtain justice, he was keenly alive to the possibilities of individual aggrandizement, and suffered himself to exact secret agreements before he would engage favorite attorneys of his, by the terms of which he was. to participate in the most liberal allowances he made to them in their contracts of employment. He likewise possessed a most remarkable influence over the legislative body of the nation and never failed to procure legislative approval of whatever he did.
After coming to Washington he engaged as attorney for the nation, to assist him in his efforts, Mr. Albert Pike, agreeing to compensate -him to the extent of thirty per centum of whatever sum might be recovered. Pike, in turn, associated with him. Mr. John T. Cochrane, to whom Pike entrusted not only the duty of an associate but the larger task of doing all that was done and performing all the work and labor in the premises. It was Mr. Cochrane, more than any other individual, who secured on June 22, 1885, 11 Stat. 611-619, the treaty between the nation and the United States by the terms of which the claim for the lands ceded to the United States under the treaty of September 27,-1830. was *802 submitted, to tbe Senate of the United States for final settlement. The treaty of 1855 proved to be a most important accomplishment. At the time, however, it was no more than the entering wedge, the initial step, which served to unify the contest, reduce the issue and submit to arbitration the disputed differences between the parties. Under the terms of this treaty, and as subsequent events proved, much remained to be done, and, indeed, long, continuous and important service, extending over a period of thirty years, was required before the substantial benefits accorded the nation in 1855 were realized in 1886.
Subsequent to the treaty of 1855 Pike, Cochrane, and John B. Ince, acting for the delegation of 1853 and the nation, secured from the Senate in 1859 the passage of a resolution fixing the value of the ceded lands per acre, followed by another resolution adopting a rule for ascertaining the amount due the nation and directing the Secretary of the Interior to investigate and render an account to the Senate in pursuance of the resolutions theretofore passed. The* Secretary reported to the Senate that there was due the nation a balance of $2,981,247.30. This is what is known as the Senate award. The Supreme Court, in the case of the Choctaw Nation v. United States, 119 U. S. 1, treated it as such and awarded the final judgment in the case upon the basis of this award.
Notwithstanding the definite basis of the award, and in the face of the resolutions fixing the rule for its ascertainment, and the detailed report of the Secretary of the Interior with respect thereto', Congress declined to appropriate the full sum awarded, and instead, on March 2, 1861, 12 Stat., 238, appropriated $500,000 for the benefit of the nation, under the treaty of 1855, $250,000 in cash, and $250,000 in Government bonds, and this constitutes the one and only appropriation that was ever made to carry into execution the Senate award, until subsequent to November 15, 1886, following the decision of the Supreme Court in the Choctaw case, sufra,
Peter Pitehlynn, the business manager of the delegation of 1853, collected, as was his right, the $250,000 cash appropriated by Congress in 1861. Out of this sum he disbursed *803 $135»()0() to one D. H. Cooper. The authority for this disbursement is not shown.' It is said'it was to buy corn for the Choctaw Nation. We are left completely in the dark as to wind became of this money, save the one fact that out of the sum received. Cooper did pay to Albert Pike $40,000 attorney's fees, which Pike afterwards. paid to Cochrane. The remaining $115,000 Pitchlynn retained, out of which the delegation was paid $74,927.45. What became of the balance is not explained to our satisfaction, unless the settlement and accounting between the delegation and the nation consummated November 1, 1861, clears up the matter. On this date the delegation and the nation stated their accounts. The nation seems to have conceded that there was due to the delegation $70.254.43, and due to Cochrane a fee of $14,140, a sum obviously in excess of twenty per centum of $250,000, as provided for in the delegation's contract with the nation. Of the conceded balance due the delegation $46,858.84 was paid in cash, leaving an unpaid balance still due them of $23,395.39. Obviously this settlement materially fails to exhaust the $115,000 collected by Pitchlynn. and no reasonable explanation appears of record for carrying forward a balance due the delegation when out of the $115.000 there remained a sufficient sum to square accounts and leave a small additional amount for the nation’s treasury. We advert to this purported settlement in tedious detail because it emphasizes the potent fact that from the beginning to the end of this persistent controversy for compensation alleged to be due the delegation of 1853, it is absolutely impossible, by any known process of mathematical calculation, to ascertain ivhat became of all the funds falling into the possession of the delegation in virtue of the appropriation of this $250,000. Pitchlynn attempts a solution by ascribing confusion due to the intervention of the Civil War. He details a circumstance of compensation paid certain individuals to induce them to hazard the attempt to break through the lines of the Union Army and carry funds to him, but throughout it all, and after the most careful consideration of every single item in the record, an examination of which materially delayed the decision in this case, *804 Ave have been unable to trace the balance due from Pitchlynn to the nation out of this $115,000 in money.
Possibly we have given too much importance to this transaction. If we are correct,, however, in our conception of the duty imposed upon the court by the terms of the jurisdictional act, we must hold a claimant for compensation to a strict accountability of trust funds coming into his possession under written authority from a cestui que trust, and out of which he is legally restrained from retaining more than a fixed per centum. Assuredly, under the principles of quauhim meruit the delegation is to be paid for services rendered the nation, and if the nation failed, either through carelessness or fraud upon the part of the trustee, the compensation of the trustee is to be charged to the extent of the injury suffered. It is true the nation seems to have been contented with the account stated, in the settlement of 1861, and we have not overlooked this fact. But the Choctaw Nation in 1861 was torn asunder and seriously divided in sentiment by the Civil War. It was the e'asy victim of persuasion and its legislative conduct does not warrant us in ascribing to its enactments that degree of deliberation and intelligence which should have char'ac'terized its proceedings. If the formidable record of fraud and venal conduct erected by the present plaintiffs in this case is believable, and we think it is, then beyond the peradventure of a doubt we would be decidedly remiss in our duty if we evince a willingness to ascribe verity or firiality to the ac'ts of a legislative body that willingly yielded to the power of bribery and corruption. The ease with which favorable legislation was obtained is astounding. Pitchlynn should have accounted in detail for this $115,000 he received. Nothing appears in the present record disclosing what' became of all of it.
During the Avar from 1861 to 1865 the unsettled net proceeds claim Avas in abeyance. The act of July 5, 1862, 12 Stat. 512, 528, suspended treaties between the United States 'and hostile Indian tribes. The Choctaw Nation, as a nation, had on July 12, 1861, entered into a treaty with the Confederate Government, and thereby came within the scope of the foregoing statute. As a matter of fact, the whole *805 controversy was in a state of suspension, and nothing of 'any consequence was or could be done during this period. After the close of the war the nation found it necessary to do again all that it had previously accomplished. The treaty of 1855 was suspended, annuities had been withheld, and if the n'ation was to again profit from treaty stipulation theretofore entered into, legislation must he had and effective service toward that end rendered. The Choctaw Council on October 17, 1865, created and appointed a commission of five persons, of which Peter Pitchlynn was not one, and this commission in conjunction with a similar body from the Chickasaw Nation, came on to Washington to negotiate for, and, if possible, secure a revival of the treaty of 1855, as well as reinstate the tribes in the good graces of the Government. If this could be accomplished the suspended, rights previously accorded the nation by the United States would again 'accrue to them. On April 28, 1866, 14 Stat. 769, a new treaty was consummated, and by its terms all previous treaties and Indian rights suspended or abrogated by legislation during the w’ar were revived, and the obligations of the Government thereunder renewed. It is difficult from the record to connect Peter Pitchlynn with the services rendered by the commission and others during the course of the proceedings which resulted in the treaty of April 28, 1866. It is positively shown that the commission of 1865 employed J. II. B. Latrobe of Baltimore, Md., as attorney for the nation at a fixed compensation of $100,000. Latrobe and his 'associates collected from the nation this $100,000, and then, strange as it may seem, Latrobe paid out of his $100,000 fee, $10,000 in cash to the four active commissioners of 1865 and $10,000 in cash to Peter Pitchlynn. One Kob-ert Jones was originally appointed one of the five commissioners on the commission of 1865; he never qualified, appeared, or rendered any service whatever, and made no claim for such, and for some reason not positively shown, Peter Pitchlynn was substituted for him when the distribution of the $50,000 was made by Latrobe, in accord with a secret contract Latrobe had with the original commissioners to do that very thing, and Peter Pitchlynn received Jones’ share *806 of the $10,000 duo under this unwholesome agreement, and $2,834 expense money, afterwards returning- to Jones $1,417 of the expense money' but retaining for himself in all $11,417. "
The mere recitation of the foregoing details is a sufficient demonstration of Avhat was going on at' this time, and the record before us can not be investigated and any other conclusion reached than that there existed at this moment, and had existed for some time before, a fraudulent conspiracy, which attained such proportions in the end as to excite a congressional investigation into the direputable affair which had for its object not the protection but the plundering of the Indians, a situation so fraught with fraud and corruption as to envelope this whole transaction, from its inception to its close, in an atmosphere of suspicion and doubt, rendering it extremely perplexing to award compensation to any individual involved or connected therewith. Peter Pitchlynn was the principal chief of the Choctaw Nation when the commission of 1865 was appointed. He approved their appointment, as well as their conduct in contracting with Latrobe to pay him $100,000, and he, himself, should suffer to the extent of $11,417 which Latrobe dishonestly disbursed to the commissioners, admitting himself when examined as a witness before the investigating committee of the House that he had done nothing to earn it. Pitchlynn, when confronted by Robert Jones-with respect to the money he received, paid Jones $1,417 expense money, and stated the $10,000 should be- credited on any sum he might be entitled to from the net proceeds case. It should be so credited, and will be in the judgment awarded.
Unfortunately for the Choctaw Nation of Indians, the rank and file, the treaty of April 26, 1866, accomplished no more than rejuvenate the old controversy and furnish a convenient and resourceful issue for a prolonged continuance of the ancient contest. At this point in the history of the claim the delegation of 1853 reappears. We need not cite in eHenso the numerous contracts entered into by the delegation with various attorneys to aid' them in securing to the nation the benefits of the treaty of 1866. The matter proceeded through varying degrees of success and failure until *807 finally, on March 3, 1881, 21 Stat. 504, Congress passed a special jurisdictional act referring the claim to this court for adjudication. This court, on February 1, 1886, 21 C. Cls. 59, awarded the nation a judgment for $408,120.32. The Supreme- Court, on November 15, 1886, 119 U. S. 1, reversed our decision and awarded a judgment for $2,858,-798.62, which with interest- added, finally attained the total sum of $3,078,370.23. Out of this total sum received the nation paid in fees to attorneys, compensation to delegates and others, $1,642,370.23, or more than half of the award, leaving to be distributed to the beneficiaries under the treaty the sum of $1,436,000.
Upon the principles of quantum■ meruit an allowance for personal service is predicated upon -what the service is reasonably worth. When one engages himself to perform a personal service for another, in estimating the value of that service, consideration must be given to the length of time employed, contributory assistance received from others, ability possessed and displayed in meeting the service enjoined, the. beneficial results obtained for his employer, and from all the facts and circumstances surrounding the transaction award compensation amply sufficient to meet what has been really earned. In this case the nation agreed to pay Peter Pitchlynn five per centum of whatever amount he might recover, a contingent fee. Pitchlynn was satisfied with the agreement, and his heirs are here now insisting upon no more. The agreement, while not conclusive, is eviden-tiary, and we believe, from the record before us, the amount stipulated is not only ample but in a measure generous. In our opinion it is beyond doubt the limit of recovery. However, in view of the present situation, we are quite willing to rest the judgment thereon.
We do not want to be understood as minimizing the efforts required and put forth to secure for the nation the final settlement of the “ net proceeds claim.” It was a tash of proportions and difficulty. It required years of consistent effort and labor. At the same time, in arriving at the compensation due. the plaintiff we are not at. liberty, in the face of the record, to ascribe to the plaintiff á greater portion of service than is reasonably manifest, -when considered in con *808 nection with, the various other individuals, lawyers, and delegates, who were associated together. A most formidable array of legal talent, in association with numerous others, familiar from experience in office Avith Indian affairs, combined with the delegation in finally procuring the judgment, and while the expense of this associated talent is not chargeable to the plaintiff, their services, in the light of the compensation paid them, must have been regarded as most effective and valuable. Assuredly, it is no exaggeration to say that without some of them at least, or others equally as proficient, the delegation would have signally failed to accomplish the purpose of its selection. So that in the final analysis we believe the contract originally entered into between the delegation and the nation reflects what we regard as most reasonable and compensatory remuneration for the services rendered by the plaintiff.
Considering Pitchlynn’s relation to the case as an entirety, the most valuable service rendered was in connection with the procurement of a special jurisdictional act sending the case to this and the Supreme Court. This act, passed a few months after his death, effectually completed, or nearly so, all he could have done had he lived until the judgment was obtained. After this event, the case required the services of lawyers. It was removed from the field of congressional action and sent to the judiciary where it was finally settled upon principles of law, and this fact is the moving cause of our opinion awarding him the amount conceded in the contract. Pitchlynn died in 1881, and it was five years later before the judgment was obtained, but in the interim the case was where it had to be, in charge of some very able, conscientious and honest lawyers, men of ability and character, who carried it to a successful conclusion, and to whom was paid a fee not at all disproportionate to what had been earned.
The plaintiff was entitled to receive one-fourth of twenty per cent of the judgment in 119 U. S. 1, plus $23,395.39 due the delegation in the settlement of 1861, or $159,736.12. There was paid to him out of the appropriation of March 2, 1861, $18,731.86. The Choctaw Council by appropriation *809 acts of 1857, 1858,1859, and 1860, paid $8,000 more. lie received $11,417 from Allen Wright, the Choctaw treasurer, this amount being the sum due one Robert Jones, a delegate of 1866 who did not act, and for wrliom .Pitchlynn apparently appeared. As before observed, his authority to so appear is extremely doubtful, so doubtful, indeed, that Pitehlynn himself subsequently agreed, when his authority was challenged, to credit this sum on any amount due him from the net proceeds case. His estate received from Leflore and McCurtain $107,811.29 in the settlement with his heirs, totaling the sum of $145,460.15 in cash. His estate is properly chargeable as having received on this account one-fourth of the following amounts paid by Leflore and McCurtain, $11,-889.84, due the delegates of 1866. See Finding YI. This amount should have been deducted from the judgment of the Supreme Court in the net proceeds case, as well as the further sum of $7,758.36 due the eastern boundary delegates, which was not done in computing the basic sum for the ascertainment of the twenty per centum due the delegation of 1853. See Choctaw Nation v. United States, 119 U. S. 1 The additional sum of one-fourth of $25,000 should be charged against the plaintiff’s estate as having been received by him in pay for the services now claimed for. In 1868 one Blunt, acting for certain loyal Choctaws, loaned the delegation of 1853 $25,000, and the delegation in 1869 agreed in writing to repay this sum out' of the compensation received from the “net proceeds claim.” The above three items seem to us as legally due the Choctaw Nation from the delegation as a credit upon their compensation account. They amount in the Pitchlynn case to $11,162.05, making a total sum paid the plaintiff’s estate of $156,622.20, leaving a balance due of $3,113.92, for which amount judgment will be awarded.
The defendant contends for additional charges against the plaintiff’s estate, and especial ^emphasis is laid upon the twenty items appearing in a memorandum attached to the will of Peter Pitchlynn. We have disregarded this memorandum. While it is in some respects an admission against interest, it is so indefinite, and the purposes of the acknowledgment so decidedly speculative, that we think it may not *810 be considered. The persons named therein might, "if living at the time, have pursued their remedy in court against the estate of Pitchlynn if the indebtedness was personal, and there is no showing that the same was a liability of the Choctaw Nation. This was not the case with respect to the $25,000 item due the loyal Choctaws. This debt was evidenced by a written agreement providing for payment out of the compensation to be received by the delegation from the net proceeds case, in effect an assignment to the creditors, and warranting its payment by Leflore and McCurtain. Finding XYI.
The sum of $85,000 paid on promises made at Tushka-liomma to seventeen persons was carefully considered. It is not, in our opinion, a proper charge against the fund in the hands of Leflore and McCurtain to be distributed among the delegation of 1853. It is difficult to comment upon this transaction with patience. It, never should have been paid out at all. The innocent members of the Choctaw Nation are, it is true, made to suffer by a species of betrayal and treachery that can not but reflect extreme discredit upon those participating in this glaring and admitted irregularity. This settlement, and the boldness accompanying its surroundings, is an acute illustration of the combined and industrious attempt upon the part of many individuals to lay hold upon some part of this Indian fund, under any pretense, legitimate or illegitimate. A tribe of untutored and illiterate Indians malieioulsly plundered by those who should have exerted every power to protect them. This sum was paid out upon supposed promises to meet certain obligations incurred by the delegation during the course of its activities. It was not and could not have been within the authority of Leflore and McCurtain to act as administrators of the estate of Peter Pitchlynn. The nation could not have conferred such authority upon them and they had no right to assume it. It is extremely doubtful if any of the various amounts which go to make xrp the $85,000 item could have been recovered from Peter Pitchlynn during his life' or against his estate after his demise. We are not warranted under the law in charging against his estate what *811 was not in any event a liability of Pitclilynn to tlie Clioctaw Nation. As we view tlie matter, Leflore and McCurtain’s authority under the law in concluding a settlement of the delegation's claim was necessarily limited to tlie nation's legal liability to Peter Pitclilynn and liis indebtedness, if any, to it. While the nation granted Leflore and McCurtain wider and more extensive powers in this most unique and unusual proceeding of divesting the treasurer and other responsible officers of tlie nation of their authority to close the transaction, yet it is our opinion that unwarranted pay-mens of strictly private and personal indebtedness, however fraudulent, was not the equivalent of discharging the nation’s indebtedness to Peter Pitclilynn.
The above argument applies with equal force to the $145,-000 paid to McKee and chai'ged to the account of the delegation. McKee was one man who successfully made away with an abnormally large proportion of the Indian’s money. He claimed to have advanced $145,000 to the delegation of 1853 right after tlie Civil War when all was confusion, and the delegation was impoverished. He did something to ingratiate himself into the good graces of the delegation of 1853, for in 1870 he procured from them a contract to prosecute the net proceeds case, which finally culminated in the payment to him of $714,699.65 and $54,924.17 interest thereon as attorney’s fees, in addition to the $145,000 paid him by Leflore and McCurtain.
As before observed, the cause of action which resulted in judgment for tlie Clioctaw Nation of Indians arose out of the treaty of 1830. Indian claims of this character, we must concede, involve tedious detail and long and persistent service. If they extend over a prolonged period of time many individuals are employed in various capacities to assist in bringing the issue to an end. Unfortunately for the Indians, the rank and file of tlie tribe, as in this case is apparent, the result when realized brings to them a small proportion of what they obviously deserved and to which they are entitled. In this case the record clearly establishes that the Choctaw Nation, through its legislative department, met every obligation the delegates of 1853 incurred in the prose- *812 eution of this claim, and appropriated tlie 20 per cent due them for their services. The total amount of the judgment recovered, with interest added, totaled the sum of $3,078,-370.23. The Council of the Choctaw Nation approved claims and attorneys’ fees and paid the same to the amount of $1,642,370.23, a substantial amount- in excess of half the judgment. Surety it may not be said that a trusted delegation of the tribe upon whom was imposed the responsible duty of collecting for it a claim of this proportion, expeditiously and with reasonable economy, are entitled, upon the principle of quantum meruit, for their services in so doing a sum in excess of what we have allowed them, when we consider that the benefits resulting to the tribe was a final distribution to it of $1,436,000 out of $3,078,370.23.
The judgment in this case is to be paid out of the funds of the Choctaw Nation. Beyond the peradventure of a doubt the nation, i. e., the Indians making up-the nation,.honestly believed that the claim now made was fully and completely settled and paid more than a quarter of a century ago; the council appropriated the money; appointed agents to make the settlement; the settlement was made; the details of the same publicly circulated; the Indians and the parties to the same were fully advised, and every incident'and circumstance of the same was fully known. The parties accepiod the money'paid, and apparently without protest. Opportunity was afforded for appearance and it was not until long years afterwards that the contest was again renewed and this case originted. If laches might intervene to forestall recovery, the defense would be conclusive.
An additional contention is advanced in this case for a compensation alleged to be due Peter Pitchlynn as a general delegate from the nation for foxirteen years. The claim is without, merit. Aside from this, we regard the allowance here made as sufficient to- compensate the- plaintiff’s decedent for all services of any kind or character rendered during the period involved. It is inconceivable that more could have been earned, and the additional claim for an annual compensation of $5,000 as a general delegate of the nation is *813 but confusing the issue. Pitchlynn, by the terms of the contract employing him, was precluded from augmenting his fees for outside services, for in this agreement he expressly stipulated to accept the five per centum for all and every character of service required.
The heirs at law of Peter P. Pitchlynn have not been established by evidence satisfactory to the court. One of the attorneys for plaintiff handed to Miss Sophia C. Pitchlynn, a witness, a paper entitled “ Memorandum of the heirs of Peter P. Pitchlynn, Choctaw, delegate, etc.,” who at the same time stated, “ I will ask you, with the exception of an addition to be made to the heirs of Mollie, deceased, married E. M. Folsom, known as Bud Folsom, and Minnie Simple, deceased, both of whom were daughters of Lycurgus Pitch-lynn, he being the son of Peter P. Pitchlynn, if the memorandum handed you correctly states the heirs of Pitchlynn?” She answered “ Yes.” The memorandum was thereupon handed to the commissioner as Exhibit A to her deposition. This was not sufficient testimony to establish all of the heirs at law of the said Pitchlynn.
Judgment for plaintiffs in the sum of $3,113.92, the payment of which will be suspended until the coming in of proof of heirship. It is so ordered.
Hat, Judge; Downey, Judge; and Campbell, Chief Justice, concur.